50 F.3d 1365
 Raymond L. HORN, Joyce A. Horn, Joseph Dues, Sharon Dues,
Alvin Timmerman, Rose E. Timmerman, Eric E. Link,
Karen K. Link, Walter A. Schwieterman,
and Frieda L. Schwieterman,
Plaintiffs-Appellants,
v.
A.O. SMITH CORPORATION and A.O. Smith Harvestore Products,
Incorporated, Defendants-Appellees.
 Nos. 94-1589, 94-1590, 94-1591, 94-1592 and 94-1599.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 4, 1994.
Decided March 20, 1995.
 
 Sherrill W. Colvin, Haller & Colvin, Fort Wayne, IN, Paul F. Shappell, Whiteman, Shappell & Burkett, Portland, IN, David W. Peck (argued), Barron, Peck & Bennie, Cincinnati, OH, B.J. Hammarback, River Falls, WI, for Raymond L. Horn et al., plaintiffs-appellants in Nos. 94-1589, 94-1590.
 Lee A. Watson, Donald E. Egan, Clay A. Tillack, Linda L. Cashmore, Stewart T. Kusper, Katten, Muchin & Zavis, Chicago, IL, D. Randall Brown, Barnes & Thornburg, Fort Wayne, IN, John C. Dods (argued), Shook, Hardy & Bacon, Kansas City, MO, for A.O. Smith Corp., et al., defendants-appellees in Nos. 94-1589, 94-1599.
 Lee A. Watson, Donald E. Egan, Clay A. Tillack, Linda L. Cashmore, Stewart T. Kusper, Katten, Muchin & Zavis, Chicago, IL, D. Randall Brown, Barnes & Thornburg, Fort Wayne, IN, John C. Dods, Margaret D. Lineberry, Kelly W. Schemenauer, Shook, Hardy & Bacon, Kansas City, MO, for A.O. Smith Harvestore Products, Inc., defendant-appellee in No. 94-1589.
 Lee A. Watson, Donald E. Egan, Clay A. Tillack, Linda L. Cashmore, Stewart T. Kusper, Katten, Muchin & Zavis, Chicago, IL, Richard E. Steinbronn, D. Randall Brown, Barnes & Thornburg, Fort Wayne, IN, John C. Dods (argued), Margaret D. Lineberry, Kelly W. Schemenauer, Shook, Hardy & Bacon, Kansas City, MO, for A.O. Smith Corp., et al., defendants-appellees in Nos. 94-1590, 94-1591, 94-1592.
 Sherrill W. Colvin, Haller & Colvin, Fort Wayne, IN, David W. Peck (argued), Barron, Peck & Bennie, Cincinnati, OH, B.J. Hammarback, River Falls, WI, Alvin Timmerman et al., plaintiffs-appellants in Nos. 94-1591, 94-1592, 94-1599.
 Lee A. Watson, Donald E. Egan, Clay A. Tillack, Linda L. Cashmore, Stewart T. Kusper, Katten, Muchin & Zavis, Chicago, IL, Richard E. Steinbronn, D. Randall Brown, Barnes & Thornburg, Fort Wayne, IN, John C. Dods (argued), Shook, Hardy & Bacon, Kansas City, MO, for A.O. Smith Corp., defendant-appellee in Nos. 94-1591, 94-1592.
 Before BAUER, KANNE, and ROVNER, Circuit Judges.
 ILANA DIAMOND ROVNER, Circuit Judge.
 
 
 1
 These five consolidated appeals raise a single question under Indiana law--whether the claims of fraud and breach of contract of the various plaintiffs are barred by the statutes of limitation. Plaintiffs all are dairy farmers who purchased or leased silos manufactured by defendant A.O. Smith Harvestore Products, Inc. ("AOSHPI"), a subsidiary of defendant A.O. Smith Corporation.[1] Plaintiffs maintain that when they purchased or leased their Harvestore silos at various times between 1976 and 1981, AOSHPI and its authorized local dealer represented, inter alia, that the silos were "oxygen-limiting"--that is, that they would limit the oxygen that could come into contact with stored feed. According to the dealer, this feature would enhance the feed's nutritional value and all but eliminate feed spoilage. Each of the five sets of plaintiffs charged in separate lawsuits that the dealer's representations were false and that their reliance on those representations caused harm to their dairy operations.[2] The district court consolidated the five cases and then granted AOSHPI's motion for summary judgment in each case, finding that the statute of limitations had run as to each claim of each plaintiff. Plaintiffs separately appealed, and we consolidated their appeals for oral argument and disposition. We now affirm the district court's judgment in three of the five cases, reverse the judgment in the remaining two cases, and remand for further proceedings.
 
 I. BACKGROUND
 
 2
 Because we are reviewing the grant of AOSHPI's motion for summary judgment, we relate the facts in the light most favorable to plaintiffs. The five sets of plaintiffs separately purchased or leased Harvestore silos from Tri-State Harvestore Systems, Inc. ("Tri-State"), an independent Harvestore dealer, between 1976 and 1981. AOSHPI and its independent dealers marketed the silos as an improvement over conventional cement silos in that they minimized the amount of oxygen that could enter the silo, thus yielding a more palatable and nutritious feed. Unlike conventional silos that are unloaded from the top, thereby exposing the uppermost layer of feed to air, the Harvestore silos are unloaded through a door located near the bottom of the structure. During the unloading process, breather bags at the top of the silo expand to prevent oxygen from entering.
 
 
 3
 For purposes of its motion for summary judgment, AOSHPI admitted that the Tri-State dealer, through its salesmen, had made certain false representations to the various plaintiffs about the attributes of the silos and the effect they would have on plaintiffs' dairy operations. In this appeal, therefore, we assume that the dealer made the following false representations to each of the five sets of plaintiffs.
 
 
 4
 First, the dealer represented that because the Harvestore silos were sealed units, virtually no oxygen would come into contact with the ensiled feed when the silo doors were closed. Plaintiffs were told that this "oxygen-limiting" capacity would all but eliminate feed spoilage.[3] The dealer also explained that breather bags at the top of the silo would compensate for any air or pressure changes within the silo, that only an insignificant amount of air would enter the silo during unloading due to the unique design of the unloader door, and that this air would be converted into a gas that would not harm the ensiled feed. According to the Harvestore dealer, only a repairable problem or improper use of the silo would cause additional oxygen to come into contact with the feed. Although Harvestore silos were significantly more expensive than conventional cement silos, the higher cost was justified, plaintiffs were told, because by preventing oxidation, excessive fermentation, and nutritional losses, the silos would greatly reduce or entirely eliminate the need to supplement feed with protein. In this regard, each of the plaintiffs were told that the resultant feed savings would cause the silos to pay for themselves over time. Plaintiffs also were told that the silos would create a warm "caramelized" feed that would be more palatable and nutritious for their cows and that would cause milk production and farm profits to increase.[4] The silos were marketed as nearly maintenance-free and capable of lasting a lifetime. Finally, plaintiffs were told that owners of Harvestore silos became part of the "Harvestore family," which meant that they could look to AOSHPI's trained representatives for prompt service and advice.
 
 
 5
 By their own account, plaintiffs did not realize that these representations were false until they attended a meeting in December 1991, where certain lawyers documented the difficulties other farmers had experienced with Harvestore silos. Asserting a variety of tort and contract claims, plaintiffs commenced the instant actions less than a year later. In moving for summary judgment, however, AOSHPI argued that each of the plaintiffs knew or should have known long before the December 1991 meeting that they had suffered cognizable injuries that were caused by the dealer's fraud. The district court agreed with AOSHPI, finding in each case that the plaintiffs' fraud claims had accrued more than six years prior to the filing of suit. See Horn v. A.O. Smith Corp., 1994 U.S.Dist. (N.D.Ind. Feb. 18, 1994). The court also rejected plaintiffs' contention that the limitations period was tolled because AOSHPI and its agents had fraudulently concealed their causes of action. Moreover, because the statutes applicable to plaintiffs' various other claims were all less than six years, the district court found each of those claims barred as well.[5] In these appeals, plaintiffs challenge the dismissal only of their fraud and breach of contract claims. We review the district court's application of a statute of limitations on summary judgment de novo. Cathedral of Joy Baptist Church v. Village of Hazel Crest, 22 F.3d 713, 716 (7th Cir.), cert. denied, --- U.S. ----, 115 S.Ct. 197, 130 L.Ed.2d 129 (1994); Fries v. Chicago & Northwestern Transp. Co., 909 F.2d 1092, 1094 (7th Cir.1990).
 
 II. DISCUSSION
 A.
 
 6
 The statute of limitations applicable to plaintiffs' fraud claims is set out in Ind.Code Sec. 34-1-2-1. See Lawyers Title Ins. Corp. v. Pokraka, 595 N.E.2d 244, 247 (Ind.1992).[6] That statute permits a plaintiff to allege fraud at any time within six years of the accrual of a cause of action. The point of accrual is not defined by statute, but is left to the courts. See Burks v. Rushmore, 534 N.E.2d 1101, 1103 (Ind.1989); Barnes v. A.H. Robins Co., 476 N.E.2d 84, 85 (Ind.1985). The Indiana Supreme Court traditionally has said that a cause of action accrues "and thus the statute of limitations begins to run, when the resultant damage of a [tortious] act is 'susceptible of ascertainment.' " Wehling v. Citizens Nat'l Bank, 586 N.E.2d 840, 842 (Ind.1992) (quoting Montgomery v. Crum, 199 Ind. 660, 161 N.E. 251, 259 (1928)); see also Madlem v. Arko, 592 N.E.2d 686, 687 (Ind.1992). Yet in Barnes v. A.H. Robins Co., 476 N.E.2d 84, 87-88 (Ind.1985), in response to a certified question from this court, the state supreme court modified its traditional rule where the plaintiff alleged an injury from the protracted exposure to a foreign substance. In that circumstance, the court applied a "discovery rule," which looked to when the plaintiff knew or should have discovered that she had been injured by the act of another. Id.; see also Burks, 534 N.E.2d at 1104. The court gradually extended application of this rule (see Autocephalous Greek-Orthodox Church of Cyprus v. Goldberg and Feldman Fine Arts, Inc., 917 F.2d 278, 288 (7th Cir.1990)) and recently applied it to all tort claims. See Wehling, 586 N.E.2d at 842-43.[7] Thus, in considering when a cause of action accrues under Indiana law, we look to "when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another." Id.; see also Fager v. Hundt, 610 N.E.2d 246, 250 (Ind.1993); Madlem, 592 N.E.2d at 687.[8] Indiana's rule thus has two components--the discovery of the injury, as well as its cause. See Evenson v. Osmose Wood Preserving Co. of Am., Inc., 899 F.2d 701, 703 (7th Cir.1990). The causation element is primarily at issue in these appeals.
 
 
 7
 Plaintiffs maintain that they did not actually discover that the problems they experienced on their farms were caused by the Harvestore silos until December 1991. Prior to that time, plaintiffs apparently were unaware that the silos were affecting their feed, thus causing the health problems in their herds and lower milk production levels. In finding plaintiffs' fraud claims barred by the statute of limitations, however, the district court focused on when each plaintiff could, in the exercise of ordinary diligence, have discovered the existence of the fraud. This "ordinary diligence" aspect of Indiana's discovery rule requires an objective inquiry into the facts of each case. Cf. Cathedral of Joy, 22 F.3d at 713; Fries, 909 F.2d at 1095. We must therefore consider whether a reasonable person in the position of these plaintiffs, possessing the information they did when they did, could have discovered through the exercise of ordinary diligence that the Harvestore silos were causing the problems on their farms.[9] See Thiss v. A.O. Smith Corp., No. 1-91-CV-239, 1993 U.S. Dist. LEXIS 11846, * 7-8 (June 29, 1993).
 
 
 8
 Despite the fact-specific nature of this inquiry, the point at which a cause of action accrues may be determined as a matter of law if the relevant facts are undisputed and they lead to but one conclusion. See Evenson, 899 F.2d at 705; cf. Cathedral of Joy, 22 F.3d at 719; Kedzierski v. Kedzierski, 899 F.2d 681, 683 (7th Cir.1990). If the accrual determination turns on the resolution of factual questions, however, summary judgment is inappropriate, and the statute of limitations issue must be submitted to a jury after trial. See Fager, 610 N.E.2d at 253 n. 5; Wehling, 586 N.E.2d at 843; Burks, 534 N.E.2d at 1104.[10]
 
 B.
 
 9
 Because the instant cases all were initiated between September and November, 1992,[11] the fraud claim of each plaintiff would be barred if the cause of action accrued prior to the fall of 1986. Although we consolidated these appeals due to the common questions they present, we must give separate consideration to the facts of each case in determining when a cause of action accrued. We must examine what each plaintiff knew or should have known at any point in time and the degree of diligence each exercised in ascertaining the cause of the problems encountered. We thus consider the facts material to each case separately.
 
 1. Raymond and Joyce Horn
 
 10
 The Horns acquired their first Harvestore silo in 1977 and leased a second silo in 1981. They originally stored corn silage in the first silo and had no complaints about how the feed kept over time. In 1981, however, after leasing the second silo, the Horns began to store high-moisture corn in the first silo and haylage[12] in the second. Sometime late in 1982 and approximately two months after they began feeding their herd a mixed ration of haylage and corn, the Horns realized that their herd's production levels were declining and that the herd's health appeared to be deteriorating. Raymond Horn knew the problem was feed-related, and he focused specifically on the haylage, which he had never before used in his dairy operations. Raymond Horn asked Bill Kipfer, a nutritionist and former Harvestore salesman, about the lack of production from his herd, and Kipfer took samples of the Horns' feed, recommending that more high-moisture corn and protein be added to the cows' ration.[13] The Horns began adding protein supplements to their feed in early 1983, and the herd's milk production rose gradually in response. The physical appearance of the cows also improved. The Horns knew in 1983, then, that they could not feed an unsupplemented ration to their cows, as their Harvestore dealer had represented. They also knew that because of the cost of these protein supplements, they would not realize the savings on feed that the dealer had projected in their farm plan. Raymond Horn did not at this point link these problems to the Harvestore silos, however, because he had never before used such silos and Kipfer had not indicated that the feed was not keeping well.
 
 
 11
 In the summer of 1983, the Horns concluded that haylage did not provide enough protein or energy for their herd, and they thus replaced the haylage in one of their silos with corn silage. They continued to store high-moisture corn in the other silo, but finally switched to shelled corn in 1989 because the high-moisture corn would not keep in the silo for more than six to eight months. A Harvestore representative convinced the Horns to have their two silos resealed in 1989 as part of a company resealing program. Up until that point, the Horns were unaware of any problem with the seals on their silos.
 
 
 12
 On the basis of these facts, the district court found as a matter of law that the Horns knew or should have known as early as 1983 that the representations made to them about milk production and feed costs were untrue and that they were incurring damages as a result. Even accepting the Horns' representations that they did not link their problems to the Harvestore silos prior to 1991, the court concluded that by 1983, the Horns at least should have investigated the silos as a possible source of their problems. We agree that the evidence addressed to the Horns supports but one reasonable conclusion as to when their cause of action accrued.
 
 
 13
 It is undisputed that shortly after the Horns began to use their second silo to feed a mixed-ration of haylage and corn, their herd's milk production dropped. Production only rose to previous levels when, at the advice of a nutritionist, the Horns began adding protein supplements to their feed early in 1983. At that point, the Horns did not go back to their Harvestore dealer and ask why adequate production levels could not be maintained without protein supplements, as had been represented to them. Although they continued to tinker with their feed rations over the years, the Horns apparently accepted that they would need to add supplements, although they realized that this would eliminate the savings on feed that their Harvestore dealer had projected. Indeed, by the summer of 1983, the Horns decided that haylage itself provided insufficient energy and protein to their herd, and they stopped feeding it, despite the fact that they had leased their second silo for the expressed purpose of feeding a mixed ration of haylage and corn that would need little or no supplementation. In our view, an ordinarily diligent farmer would have investigated further before abandoning haylage altogether. Such a farmer would at least have asked his Harvestore dealer about the lack of production from his herd and about the need to add supplements. The record indicates, however, that the Horns stopped feeding haylage without ever confronting their dealer with their problems. Indeed, the record reveals that the Horns made little if any attempt to investigate the cause of their herd's problems, and they never included the silos themselves as a possible subject of investigation. See Miles v. A.O. Smith Harvestore Prods., Inc., 992 F.2d 813, 816-17 (8th Cir.1993) (summary judgment proper where plaintiff knew that the silo had not produced the represented results but made no attempt to discover the cause of the problem). We thus agree that the Horns' cause of action accrued sometime in 1983 and that it is barred unless the limitations period was for some reason tolled.
 
 
 14
 In that regard, the Horns rely on Indiana's doctrine of fraudulent concealment. Ind.Code Sec. 34-1-2-9, the statutory codification of that doctrine, provides:
 
 
 15
 If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limitation after the discovery of the cause of action.
 
 
 16
 This doctrine is available in Indiana "to estop a defendant from asserting the statute of limitations 'when he has, either by deception or by a violation of duty, concealed from the plaintiff material facts[,] thereby preventing the plaintiff from discovering a potential cause of action.' " Fager, 610 N.E.2d at 251 (quoting Burks, 534 N.E.2d at 1104). To invoke the doctrine where no fiduciary relationship exists between the parties, however, a plaintiff must show that the wrongdoer was not simply silent but committed affirmative acts designed to conceal the cause of action. See, e.g., Malachowski v. Bank One, Indianapolis, 590 N.E.2d 559, 563 (Ind.1992); French v. Hickman Moving & Storage, 400 N.E.2d 1384, 1389 (Ind.Ct.App.1980); Morgan v. Koch, 419 F.2d 993, 998-99 (7th Cir.1969). A plaintiff also must demonstrate that he exercised reasonable care and due diligence to discover the fraud. Malachowski, 590 N.E.2d at 563; Miller v. A.H. Robins Co., 766 F.2d 1102, 1106 (7th Cir.1985); Morgan, 419 F.2d at 999. Thus, "when a plaintiff learns of information that would lead to the discovery of the cause of action through diligence, the statute of limitations begins to run, regardless of concealment." Miller, 766 F.2d at 1106-07.
 
 
 17
 Perhaps this tolling provision might apply if the Horns had complained to their dealer or to AOSHPI itself about the problems they encountered and been told that some other factor (e.g., their haylage chopping practices or the weather) was responsible. But the Horns did not complain, so that any concerns they may have had with the silos themselves were never deflected by the dealer. Indeed, the Horns point to nothing in the record that may properly be characterized as an affirmative act of concealment. In any event, their lack of diligence in investigating the problems with their herd, which we discussed above in determining when their cause of action accrued, also dooms their reliance on the fraudulent concealment doctrine. Cf. Autocephalous Greek-Orthodox Church, 917 F.2d at 288. Because the limitations period was not tolled, the Horns' fraud claim is time-barred.
 
 2. Joseph and Sharon Dues
 
 18
 The Dues leased two Harvestore silos in May 1981, one to store haylage and the other for ground ear corn. Once they began using the silos in the fall of that year, the Dues noticed a drop in their herd's milk production. They immediately added supplements to the feed to increase production, and they also brought the problem to the attention of their Harvestore dealer. The dealer told the Dues that their haylage had lost some of its protein because it had not been put up properly in the silo. The dealer also explained that the Dues' herd needed time to adjust to the new feeding system.
 
 
 19
 Once the silo was filled with a new crop of haylage in May 1982, the Dues again eliminated protein supplements, but by October of that year, after the herd's production had again declined, they began to supplement their feed on a consistent basis. By the following year, the Dues' milk production still had not increased, and when confronted with the problem, their dealer offered a catalog of explanations, none relating to the Harvestore silos themselves. For instance, the dealer insisted that the haylage was not being put up properly because the Dues were chopping it either too fine, too long, or too short, or they were storing it at the wrong moisture content. Even by 1983, the dealer also persisted in suggesting that the herd might still be adjusting to the new feeding system. By 1985, the Dues were told that their alfalfa haylage was not picking up nutrients in the field and that they should again try harder the following year. This constant criticism of their haylage practices made the Dues believe that they were doing something wrong; they did not suspect that the Harvestore silo itself was the source of the problem. Because they had no previous experience with Harvestore silos, the Dues believed what their Harvestore dealer told them.
 
 
 20
 After the Tri-State dealership went out of business sometime in 1985, the Dues discussed their production problems with at least two nutritionists, one of whom was Kipfer, the former Harvestore salesman. Both nutritionists recommended that the Dues continue to add energy and mineral supplements to their feed, but neither made any connection between the lack of milk production and the Harvestore silos. The Dues also asked their veterinarian about the lack of production, and he too recommended that the herd be given more energy supplement in its ration.
 
 
 21
 Aside from their production problems, the Dues also observed, as early as 1982, white and red molds growing in their feed. They were concerned that mold would grow in a sealed, "oxygen-free" unit, and they thus questioned their Harvestore dealer about it. The dealer told the Dues that both the white and red molds grow in the absence of oxygen and that the molds actually are beneficial to the herd.
 
 
 22
 The Dues' herd also experienced sporadic leg and feet problems after the Dues began to use the Harvestore silos. Moreover, the Dues noticed that certain of their cows had lost weight and generally did not appear as healthy. These problems too were brought to the veterinarian's attention, and he recommended various remedies. Between 1983 and 1985, a Harvestore representative told the Dues during a farm tour that sore feet could occur in Harvestore-fed cows because the enhanced protein content of the feed causes looser manure and therefore generally wetter conditions for the cows. In that regard, the Dues were told to accept the bad with the good.
 
 
 23
 Before the meeting with the attorneys in December 1991, the Dues apparently made no connection between the various problems on their farm and the Harvestore silos. Joseph Dues maintains that if he had suspected that the silos were the source of his problems, he would not have continued to use them to store haylage.
 
 
 24
 In finding that the Dues had not been sufficiently diligent in investigating the cause of their many problems, the district court emphasized that they made no contact with any AOSHPI representative after 1985, when the local Harvestore dealership went out of business. Yet the court acknowledged that prior to that time, the Dues had consistently confronted their dealer about the lack of milk production and the need to add protein supplements to their feed. Because the court believed that by 1985, the Dues simply had accepted that the feed savings projected by their dealer would never materialize, it found that their fraud claim accrued at least by that date. Yet we think this finding may have placed too great an investigatory burden on the ordinarily diligent dairy farmer, and we therefore reverse the judgment below and remand for a trial.
 
 
 25
 It was significant to our resolution of the Horns' appeal that those plaintiffs had failed to raise questions with their Harvestore dealer when the production and profit levels they had been expecting did not materialize. The same cannot be said for the Dues, however, as the district court acknowledged. The Dues repeatedly confronted their dealer when problems arose, and they consistently were told either that they were chopping or storing their haylage incorrectly. An ordinarily diligent farmer could interpret the dealer's comments to mean that once the haylage was chopped and stored correctly and the cows became accustomed to their feed, the dealer's projections would be met. Cf. Hines v. A.O. Smith Harvestore Prods., Inc., 880 F.2d 995, 998 (8th Cir.1989) (farmer reasonably could rely on dealer's explanation that problems were caused by faulty seals and that the silo would perform as represented after resealing); see also Miles, 992 F.2d at 817 (discussing Hines ); Agristor Leasing v. Meuli, 634 F.Supp. 1208, 1221-22 (D.Kan.1986) (denying summary judgment where dealer may have lulled farmer into believing that the problems could be corrected), aff'd, 865 F.2d 1150 (10th Cir.1988).
 
 
 26
 It of course is true that the local Harvestore dealership went out of business in 1985 and that no one associated with AOSHPI told the Dues after that point that their haylage techniques were still deficient. But we are reluctant to say as a matter of law that the Dues' cause of action accrued prior to September 16, 1986, simply because they stopped asking questions a year earlier. The problems the Dues experienced in 1985 and thereafter were identical to those they already had brought to the dealer's attention in previous years. The dealer had consistently told the Dues that they must do better with their haylage, and there is nothing to indicate that the dealer's response would have changed either in 1986 or 1987. A reasonable jury could find that the Dues' acted like ordinarily diligent farmers in light of what they knew and had been told by their Harvestore dealer. Thus, the accrual question in their case does not lend itself to summary judgment, but should be resolved by a jury after a trial. See Agristor Financial Corp. v. Van Sickle, 967 F.2d 233, 240 (6th Cir.1992) (jury should resolve conflict in the evidence over when the plaintiff knew or should have discovered the defendant's fraud); Agristor Leasing v. Saylor, 803 F.2d 1401, 1405 (6th Cir.1986) (statute of limitations question should be submitted to jury where Harvestore dealer repeatedly told farmer that everything was fine and that there was "nothing wrong" with the Harvestore equipment); cf. Veldhuizen v. A.O. Smith Corp., 839 F.Supp. 669, 675-76 (D.Minn.1993) (although dealer blamed problems on the plaintiffs' management of the silo and its contents, no factual issue presented where the plaintiffs had been warned by two doctors familiar with Harvestore litigation that the silos themselves were the cause of the problems).
 
 3. Alvin and Rose Timmerman
 
 27
 The Timmermans acquired their first Harvestore silo in 1976 in order to store haylage. At that time, the Timmermans were seeking to feed their herd a total haylage ration, which their Harvestore dealer had indicated would all but eliminate the need for protein supplements. Yet milk production did not increase once the Timmermans began to feed the haylage ration, and the health of their herd generally declined. The Timmermans complained to their dealer, who tested samples of the Timmerman's haylage and eventually told them that the herd needed time to adjust to the new feed. The Timmermans also noticed that a white mold had developed in the ensiled haylage, but their dealer assured them that this mold grew in the absence of oxygen and was beneficial to the cows. The Timmermans' complaints, however, prompted Harvestore representatives to check the seals on the haylage unit and to reseal the entire structure in 1978, although they told Alvin Timmerman that the old seals had not been leaking.
 
 
 28
 Because milk production did not increase in response to a total haylage ration, the dealer told the Timmermans they could increase production and lower their feed costs by feeding a total mixed ration that included haylage and high-moisture corn. This led the Timmermans to purchase a second Harvestore silo in 1980 to store the corn. Yet when the Timmermans filled the corn unit in the fall of 1980 and began feeding a total mixed ration, their herd's milk production did not increase, and by 1981, the Timmermans knew that their production levels would fall far short of those projected by the Harvestore dealer. By 1983, moreover, the Timmermans realized that they needed to add protein supplements on a consistent basis in order to maintain production levels. By that point, then, the Timmermans knew that the feed savings their dealer had projected would not materialize.[14] Yet despite these realizations, the Timmermans purport to have been unaware of the precise cause of their production problems. They maintain that they never blamed these problems on the Harvestore silos.
 
 
 29
 During the sixteen-year period between 1976 and 1991, the Timmermans consulted a number of veterinarians, nutritionists, and feed labs in an attempt to increase their herd's production. One veterinarian and one nutritionist separately suggested that dry hay be added to the ration, and the Timmermans did so with little effect between 1983 and 1986. Moreover, the Timmermans had samples of their feed tested every four to six months throughout this period. None of their consultants ever linked the Timmermans' production or health problems to the Harvestore feed. The Timmermans apparently did not learn that the silos were the source of their problems until the December 1991 meeting with their present lawyers.
 
 
 30
 On this record, the district court found that the Timmermans' cause of action accrued by 1983 at the latest. It was in that year, the district court explained, that the Timmermans ceased searching for the cause of their problems and simply accepted that protein supplements were required to maintain necessary production levels.
 
 
 31
 In our view, the Timmermans are in a position similar to that of the Horns. Shortly after they began feeding a total mixed ration that utilized feed from both silos, the Timmermans realized that the necessary and projected production levels could not be met without the addition of protein supplements. They thus knew at least by 1983 that the feed savings their dealer had projected would not occur. Yet even when armed with this information, the Timmermans never complained to their Harvestore dealer.[15] In that sense, they responded like the Horns and unlike the Dues once they realized that something was wrong. We said in discussing the Horns' appeal that an ordinarily diligent farmer should at least have raised these issues with the dealer once he knew that the dealer's representations were not coming true. The Timmermans failed to do that, and in contrast to the Dues then, there is no possibility that the dealer lulled them into blaming some factor other than the Harvestore silos. Although the evidence indicates that the Timmermans utilized a number of nutritionists and feed consultants over the years, there is no evidence that they ever asked these consultants whether the Harvestore silos may be affecting their feed. We think that by 1983, an ordinarily diligent farmer would have been suspicious about the silos and would have asked some pointed questions either of their Harvestore dealer or of their paid consultants. See Johnston v. Agristor Credit Corp., No. 84-4421-S, 1987 U.S.Dist. LEXIS 12871, * 15-16 (D.Kan. Nov. 23, 1987) (granting summary judgment on basis of a statute of limitations defense when, over six-year period, the plaintiffs failed to include the Harvestore equipment as a possible source of their problems). The Timmermans' failure to do so bars their claim. See Miles, 992 F.2d at 816-17.[16]
 
 4. Walter and Frieda Schwieterman
 
 32
 Prior to 1978, the Schwietermans had never used silos in their dairy operation but had fed baled hay and ground ear corn. In 1978, however, the Schwietermans were looking to expand their operations, and they bought their first Harvestore silo to store haylage for their herd. They bought a second silo to store high-moisture corn in July 1980. Milk production did not increase when the Timmermans began feeding their herd haylage from the first unit in 1978, and a nutritionist eventually recommended that they add protein supplements to the feed. Although the need for supplements was inconsistent with what they had been told in purchasing their first silo, the Schwietermans did not complain to the dealer when they purchased their second unit in 1980. In 1981, when the Schwietermans were using both the haylage and corn units to feed a total mixed ration, they noticed that the overall health of their herd was deteriorating, in that the cows were losing body weight and milk production was declining. At one point in 1981, the Schwietermans realized that one of the breather bags in their haylage unit was defective and that this had caused the feed in that unit to lose its nutritional value. Once they replaced the breather bag, the Schwietermans added supplements to the ensiled feed to restore the nutrients that had been lost. They consistently added supplements to their feed after that point, and by 1984, the Schwietermans realized that their overall feed costs would be consistently higher than the dealer had projected in their farm plan. Yet, despite these problems, the Schwietermans never consulted with their Harvestore dealer or with anyone else associated with AOSHPI after 1981.
 
 
 33
 In addition to their production problems, the Schwietermans also observed mold in the haylage unit as early as 1979. They did not complain to their dealer, however, because they had been forewarned that a white penicillin mold might appear in the haylage but that this mold grows in the absence of oxygen and actually is beneficial to the herd. Walter Schwieterman also observed mold in the corn unit in 1981 or 1982, but he never asked the dealer about it because he apparently assumed the mold was similar to the penicillin mold he had seen in the haylage unit. Yet, Walter Schwieterman knew when mold appeared in the corn that something was wrong, and he thus had the door to the corn unit resealed in 1982. Mold appeared again in 1984, however, and Walter Schwieterman knew that something still was not right, but after consulting a nutritionist, he continued to use the affected corn to feed a total mixed ration.
 
 
 34
 The Schwietermans also employed veterinarians to treat various health problems, including loss of body weight, liver problems, dysentery, and sore feet, that appeared once they began using the Harvestore silos. Indeed, the Schwietermans observed that their veterinarian bills were significantly higher after they purchased the silos. However, the Schwietermans' veterinarians never indicated that any of the herd's health problems were feed-related.
 
 
 35
 The Schwietermans maintain that before December 1991, they did not associate any of their herd's problems with the Harvestore silos. When milk production did not increase or the cows experienced health ailments, the Schweitermans believed either that they were doing something wrong or that the cows were diseased. They never blamed their problems on the Harvestore silos.
 
 
 36
 From what we have said about the Horns, Dues, and Timmermans, it should be clear that the Schwietermans' fraud claim also is time-barred. Like the Horns and Timmermans, the Schwietermans never questioned their Harvestore dealer about any of their problems, not even in purchasing a second silo in 1980. At that point, the Schwietermans already knew that unsupplemented haylage from the first silo had failed to produce the production levels they were expecting. Moreover, when mold appeared in the corn unit in 1982 and then again in 1984, Walter Schwieterman knew something was wrong but continued to feed the moldy corn to his herd without raising the issue with his dealer. Finally, although the Schwietermans utilized veterinarians and nutritionists over the years, there is no evidence that they ever asked these consultants about the Harvestore silos. We thus agree with the district court that the evidence permits but one conclusion--that the Schwietermans' cause of action accrued some time prior to 1985 and that AOSHPI and its agents did nothing to toll the limitations period.
 
 5. Eric and Karen Link
 
 37
 The Links leased both a corn and a haylage unit from the Tri-State dealership in the summer of 1981, and a year later, they realized that their herd's milk production was declining. At the recommendation of a nutritionist, the Links began adding protein supplements to their feed early in 1983, and for the most part, they have continued to do so to the present day. When the milk production they had been expecting from unsupplemented feed did not materialize, the Links raised questions with their Harvestore dealer. They were told that the lack of production could be the result of their haylage chopping techniques,[17] the weather, stressed cows, or other farm management practices. The dealer never indicated that the problem may lie with the Harvestore silos themselves. Milk production increased once the Links began to supplement their feed, but they knew in 1983 that the need for supplements would eliminate the feed savings their Harvestore dealer had projected.[18]
 
 
 38
 Perhaps as early as 1982 and at least by 1984 or 1985, the Links also were experiencing more problems with the health of their herd. Specifically, foot rot and lameness were commonplace, affecting the ability of some cows even to stand and to walk. Eric Link originally believed that these problems were weather-related or perhaps the result of an infestation by some organism. Harvestore representatives eventually told the Links, however, that haylage feed causes looser manure and a wetter environment for the cows and that some foot problems are to be expected. The Links were told not to "get excited about" this situation. Moreover, throughout the 1980s and early 1990s, some of the Links' cows experienced longer breeding cycles, but neither their artificial inseminator, nutritionist, or their various veterinarians linked this problem to the Harvestore feed. These consultants generally recommended that more high-energy grain be fed to the affected cows.
 
 
 39
 The Links also periodically noticed mold between the layers of feed in the haylage unit. They generally disregarded the mold, however, because they previously had been told by Harvestore representatives that the mold grew in the absence of oxygen and was harmless. Mold also would appear in the corn unit when the silo was nearly empty. Harvestore representatives told the Links that this mold too was harmless, but Eric Link was uncomfortable feeding moldy corn to his herd because he knew it affected the corn's nutritional value. As a result, he built a grate to catch the affected corn and would not feed it to his cows.
 
 
 40
 Over the years, the Links consulted approximately eight nutritionists and feed ration consultants in an attempt to raise their production levels. None of these consultants ever said anything derogatory about the Harvestore silos. In 1988, the Links installed a computer feeding system designed to formulate the proper feed ration for each cow. Throughout this time period, the Links were satisfied with the performance of the Harvestore silos and never blamed the silos for their many problems.
 
 
 41
 In concluding that the statute of limitations had run, the district court found that the Links' fraud claim had accrued at least by 1983 because it was at that point that the Links knew that the dealer's representations were false. The district court believed that despite this knowledge, the Links had failed to include the silos as a possible target of their investigation, as an ordinarily diligent farmer would. When the evidence is viewed in the light most favorable to the Links, however, we do not find it so one-sided as to allow but one reasonable conclusion.
 
 
 42
 The record compiled by the Links falls somewhere between the evidence adduced by the Horns, Timmermans, and Schwietermans on the one hand, and by the Dues on the other. It appears that the Links were more diligent than the former group in seeking out the cause of their various problems but less diligent than the Dues. For example, the Links did confront their Harvestore dealer when milk production did not meet projected levels, when mold appeared in the corn unit, and when an inordinate number of their cows experienced problems with their feet. Yet it does not appear that the Links were as persistent as the Dues in raising questions about the need for protein supplements to maintain acceptable production levels. When the Links did raise questions, however, their dealer always seemed to deflect attention from the silos. When the Links complained about their lack of production, for instance, the dealer explained, among other things, that they may be chopping their haylage incorrectly, and the Links then attempted to follow the dealer's recommendations in that regard. They were told not to "get excited about" the foot problems that developed in their herd because the Harvestore feed produced a wetter environment for the cows. Finally, although Eric Link was uncomfortable feeding moldy corn to his herd, Harvestore representatives told him that like the penicillin mold he had seen in the haylage, this mold too was harmless. It appears to us that the Links went to great lengths over the years to attempt to increase the production of their herd, and the dealer's comments when approached with these various problems tended to direct their attention away from the Harvestore silos. Although the issue is a close one, we do not think it possible to say as a matter of law that the Links should have discovered prior to November 1986 that they had been injured through the dealer's fraud. If the Links' assertions are believed, a reasonable jury could find that their cause of action accrued after that point. See Hill v. A.O. Smith Corp., 801 F.2d 217, 225 (6th Cir.1986) (question of when the plaintiffs should have discovered that the silos were the source of their problems is for the jury). We thus reverse and remand their claim for a trial.
 
 C.
 
 43
 Plaintiffs also have asked that we review the dismissal of their breach of contract claims under Indiana's four-year statute of limitations. See Ind.Code Sec. 26-1-2-725(1). Although they concede that these causes of action accrued when the silos were delivered to their farms (see Ind.Code Sec. 26-1-2-725(2) ("A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach")), they contend that the limitations period was tolled by AOSHPI's fraudulent concealment of their claims. See Ind.Code Sec. 26-1-2-725(4) (tolling rules apply to contract claims).
 
 
 44
 It should be clear from what we have said above that the claims of the Horns, Timmermans, and Schwietermans cannot survive the shorter limitations period applicable to breach of a contract for sale under Indiana law. We also cannot agree that the doctrine of fraudulent concealment can be used by these plaintiffs to toll the limitations period. We believe, however, that the contract claims of the Dues and Links should proceed to trial along with their fraud claims so that a jury can determine whether the dealer's responses to the various complaints of these plaintiffs tolled the limitations period. See Fager, 610 N.E.2d at 253 n. 5 (factual issues relating to fraudulent concealment doctrine may be determined by jury at trial); see also Hines, 880 F.2d at 999 ("... normally in a statute of limitations context, fraudulent concealment and a plaintiff's due diligence are questions of fact unsuited for summary judgment.").
 
 III. CONCLUSION
 
 45
 We agree with the district court that the fraud and breach of contract claims of the Horns, Timmermans, and Schwietermans are barred by the statutes of limitation applicable to those claims under Indiana law. We thus AFFIRM the district court's judgments in appeal Nos. 94-1589, 94-1591, and 94-1599. We do not find the evidence so one-sided, however, as to the claims of the Dues and the Links. The limitations issues in those cases should be submitted to a jury after a trial. We therefore REVERSE the judgments in appeal Nos. 94-1590 and 94-1592 and REMAND the fraud and breach of contract claims in those cases to the district court for further proceedings.
 
 
 46
 IT IS SO ORDERED.
 
 
 
 [1]
 We shall refer to the defendants collectively as "AOSHPI."
 
 
 [2]
 Similar allegations have been made against AOSHPI in a number of federal and state cases. See, e.g., Miles v. A.O. Smith Harvestore Prods., Inc., 992 F.2d 813 (8th Cir.1993); Agristor Financial Corp. v. Van Sickle, 967 F.2d 233 (6th Cir.1992); Estate of Korf v. A.O. Smith Harvestore Prods., Inc., 917 F.2d 480 (10th Cir.1990); Hines v. A.O. Smith Harvestore Prods., Inc., 880 F.2d 995 (8th Cir.1989); Agristor Leasing v. A.O. Smith Harvestore Prods., Inc., 869 F.2d 264 (6th Cir.1989); Agristor Leasing v. Saylor, 803 F.2d 1401 (6th Cir.1986); Hill v. A.O. Smith Corp., 801 F.2d 217 (6th Cir.1986); Klehr v. A.O. Smith Corp., 875 F.Supp. 1342 (D.Minn.1995); Veldhuizen v. A.O. Smith Corp., 839 F.Supp. 669 (D.Minn.1993); Thiss v. A.O. Smith Corp., No. 1-91-CV-239, 1993 WL 771013, 1993 U.S.DIST. LEXIS 11846 (W.D.Mich. June 29, 1993); Mohr v. A.O. Smith Corp., No. 88-CV-10043-BC, 1994 WL 178111, 1993 U.S.DIST. LEXIS 19226 (E.D.Mich. Mar. 25, 1993); Nelson v. A.O. Smith Harvestore Prods., Inc., No. 86-4230-R, 1990 WL 252135, 1990 U.S.DIST. LEXIS 17850 (D.Kan. Dec. 4, 1990); Johnston v. Agristor Credit Corp., No. 84-4421-S, 1987 WL 348509, 1987 U.S.DIST. LEXIS 12871 (D.Kan. Nov. 23, 1987); Agristor Leasing v. Meuli, 634 F.Supp. 1208 (D.Kan.1986), aff'd, 865 F.2d 1150 (10th Cir.1988); Boyd v. A.O. Smith Harvestore Prods., Inc., 776 P.2d 1125 (Colo.Ct.App.1989); Buller v. A.O. Smith Harvestore Prods., Inc., 518 N.W.2d 537 (Minn.1994); First Nat'l Bank of Louisville v. Brooks Farms, 821 S.W.2d 925 (Tenn.1991). Indeed, in affirming a substantial punitive damage verdict against the company, the Tenth Circuit observed that AOSHPI has known for quite some time "that grain stored in Harvestore silos was subject to excessive spoilage." Estate of Korf, 917 F.2d at 485
 
 
 [3]
 Some of the plaintiffs explained that AOSHPI's promotional materials likened the silos to sealed fruit jars that would preserve feed over time in nearly its original condition
 
 
 [4]
 Indeed, to convince plaintiffs to purchase or lease one or more silos, Harvestore salesmen would formulate a "farm plan" specifically addressed to a particular farmer's operations. These plans projected the additional profits that could be realized through the use of Harvestore silos
 
 
 [5]
 In addition to fraud, each plaintiff also alleged breach of contract, breach of implied warranty, breach of express warranty, and strict liability claims
 
 
 [6]
 The parties agree that Indiana's limitations periods apply in these diversity cases. See, e.g., Walker v. Armco Steel Corp., 446 U.S. 740, 745, 100 S.Ct. 1978, 1982-83, 64 L.Ed.2d 659 (1980)
 
 
 [7]
 The Wehling court merged Indiana's traditional "ascertainment" rule and the emerging discovery rule because it saw no significant difference between the two. 586 N.E.2d at 843
 
 
 [8]
 The Indiana courts have applied this rule to the six-year statute of limitations applicable to fraud. See INB Nat'l Bank v. Moran Elec. Serv., Inc., 608 N.E.2d 702, 708 (Ind.Ct.App.1993); cf. Madlem, 592 N.E.2d at 687
 
 
 [9]
 In making this assessment, we are mindful that lower milk production and poor herd health may be the result of a multitude of factors and that it may be difficult for a dairy farmer to isolate the precise cause of those problems. See Mohr v. A.O. Smith Corp., No. 88-CV-10043-BC, 1994 WL 178111, * 3 1993 U.S.DIST. LEXIS 19226, * 7-8 (E.D.Mich. Mar. 25, 1993) ("Although in hindsight it is not difficult to conclude that the Mohrs should have known shortly after installing the Harvestore units that they were the cause of their problems, review of the evidence in this case ... makes clear that dairy farming is at least as much an art as it is a science.")
 
 
 [10]
 The Indiana Court of Appeals has considered the accrual question in one similar case involving Harvestore silos. See Colglazier v. A.O. Smith Corp., No. 28A01-8810-CV-00310, 541 N.E.2d 316 (Ind.Ct.App. June 22, 1989). There, the court reversed a grant of summary judgment because factual questions remained as to when the plaintiffs' cause of action accrued. Because we are required in these diversity actions to follow the substantive law of the State of Indiana, plaintiffs ask that we accord the Colglazier decision "significant precedential value." (Pl. Reply Br. at 8.) Although admittedly on point, Colglazier is an unpublished memorandum opinion, and Indiana's rules make plain that such opinions shall not "be regarded as precedent nor cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel or the law of the case." Ind.R.App.P. 15(A)(3). Plaintiffs do not rely on Colglazier for any of these purposes, and the Colglazier decision thus has no precedential value here
 
 
 [11]
 The Horns and Dues filed their complaints on September 16, the Timmermans and Schwietermans on October 1, and the Links on November 16
 
 
 [12]
 By "haylage," the parties mean alfalfa silage stored in a silo at a designated moisture content to promote fermentation
 
 
 [13]
 Kipfer gave no indication that the feed was not keeping well in the Harvestore silos
 
 
 [14]
 Indeed, the Timmermans stopped feeding a total mixed ration in 1983 and began using a computerized feeding system
 
 
 [15]
 Of course, the Timmermans had complained about a lack of production when they were feeding only from the haylage unit in approximately 1977. Yet after the dealer made additional representations in 1980 to induce the Timmermans to purchase a second silo, they never went back to the dealer when their expectations were not met
 
 
 [16]
 As with the Horns, the Timmermans' reliance on the doctrine of fraudulent concealment to toll the limitations period is unpersuasive. See supra, at 1372
 
 
 [17]
 The Links followed the dealer's recommendations in chopping their haylage, but that made no difference to their production levels
 
 
 [18]
 There were times through the years when the Links could not afford to buy protein supplements, and thus, they fed unsupplemented feed